FILED

2006 Dec-01  PM 03:32
U.S. DISTRICT COURT
N.D. OF ALABAMA

## UNITED STATES DISTRICT COURT
### FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

|  |  |  |
|---|---|---|
| MORRISON MANAGEMENT SPECIALISTS, INC., | } } } | |
| Plaintiff, | } } | CASE NO. 2:05-cv-1610-RDP |
| v. | } } | |
| AMERICAN RETIREMENT CORPORATION, et al., | } } } | |
| Defendants. | } | |

## MEMORANDUM OPINION

The court has before it Defendants American Retirement Corporation and ARC Galleria Woods, Inc.'s Motion for Summary Judgment (Doc. # 23) filed June 1, 2006, and Plaintiff Morrison Management Specialists, Inc.'s Motion for Summary Judgment (Doc. # 24) filed June 1, 2006. These cross-motions have been fully briefed and were under submission as of July 3, 2006. (Docs. # 8, 12, 19). For the reasons outlined below, the court finds that Plaintiff's motion is due to be denied while Defendant's motion is due to be granted, in part, and denied, in part.

## I.  Legal Standards for Evaluating a Summary Judgment Motion

Summary judgment is proper only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R .Civ. P. 56(c). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the nonmovant. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *See id.* at 249.

## II.   Relevant Undisputed Facts[1]

Plaintiff Morrison Management Specialists, Inc. ("Morrison") is in the business of supplying food management services to public and private institutions in the United States. (Doc. # 18, at ¶ 1). American Retirement Corporation ("ARC") operates independent and assisted living centers throughout the United States.  In August 1996, Senior Living Community, Inc. ("Senior Living") contracted with Morrison to operate and manage Senior Living's food services program at its continuing care retirement facility, Galleria Woods, located in the Riverchase area of Jefferson County, Alabama. (Haimbaugh Depo., PX 5).

Morrison employed a full-time Director of Dining Services and an Assistant Director of Dining Services to manage and supervise Galleria Woods' food preparation and service.  (Ader Depo., at 22).  Harris Ader was the Director of Dining Services.  (Ader Depo., at 29).  Cleola Hopkins was the Assistant Director of Dining Services.  (Doc. # 27, Ex. 7, at 000010).  Ader signed a non-compete agreement with Morrison (Ader Depo., at 30), but Hopkins did not (Hopkins Dec.).

In late 2004, ARC entered into an agreement with Senior Living to purchase its Galleria Woods facility.  (Haimbaugh Depo., PX 4). As part of the transaction, ARC assumed the rights and obligations of Senior Living in accordance with the preexisting contracts between Senior Living and other parties, including Morrison.  (Ader Depo., PX 4, at C-1; Doc. # 27, at Ex. G).  Before the sale was finalized, ARC began preparing the facility for the change in ownership.  (Haimbaugh Depo., at 54-56).  ARC selected Lisa Haimbaugh, ARC's Regional Director of Special Projects, to lead the transition from Senior Living to ARC ownership.  (Haimbaugh Depo. at 26, 54).

---

[1] If facts are in dispute, they are stated in the manner most favorable to the non-movant. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993).

A.      **Termination of the Contract**

The contract that was originally entered between Morrison and Senior Living, and that was subsequently assumed by ARC (hereinafter the "Morrison Agreement"), provides as follows concerning termination:

> 3.1     The initial term of this Agreement will extend from the Effective Date for a period of one (1) year and is automatically renewable for successive one (1) year periods, unless earlier terminated (a) at any time by mutual written agreement of the parties, (b) at any time by either party, with or without cause, *upon sixty (60) days prior written notice of termination to the other party*, (c) at the end of the initial term, or any successive term, by either party upon thirty (30) days prior written notice of termination to the other party, (d) by Morrison, at its option, upon five (5) days prior written notice of termination to Senior Living upon the failure of Senior Living to pay any amounts due hereunder within thirty (30) days from the date of Morrison's billing, and (e) by either party immediately upon written notice to the other party upon the failure of such other party to perform any duty or obligation of such other party hereunder (other than the failure to pay and other than as provided in Article 9 hereof) unless such failure is cured within thirty (30) days of receipt of written notice from the nondefaulting party identifying such failure.

> 3.2     Notwithstanding § 3.1 above, the parties acknowledge that significant effort and expense has been made by each party in developing the relationship and pursuing the opportunity to reach this Agreement.  As a result, the parties agree that this Agreement shall not be terminated by Senior Living *within six (6) months of any change by Senior Living of its primary contact with Morrison*, unless such termination is based upon a material breach of this Agreement by Morrison which is not cured within thirty (30) days of written notice to Morrison.

(Haimbaugh Depo., Ex. 2, PX 5) (emphasis added).  The contract also specifically provides for assignment of the Morrison Agreement provided that Morrison consents to the assignment:

> 11.4.   This Agreement and the rights and obligations of the parties hereto will inure to the benefit of, will be binding upon, and will be enforceable by Senior Living and Morrison, and its lawful successors, representatives and assigns and shall be assignable by Senior Living only upon the prior written approval of Morrison.

(Haimbaugh Depo., Ex. 2, PX 5).

Under Senior Living's ownership of the Galleria Woods facility, Ader (as Director of Dining Services) reported to Liz Prosch, the Executive Director of Galleria Woods. (Hopkins Depo. at 40, Ex. D; Ader Depo. at 22). However, after ARC purchased Galleria Woods and assumed the Morrison Agreement, ARC decided to replace Prosch with Faye Read, an employee of ARC. (Doc. # 27, Ex. I; Ader Depo., at 28; Hopkins Depo., at 61). ).[2] Additionally, on or before January 20, 2005, Ader was informed that during the transition he should report to Roger McAleese, a Regional Director of Dining Services for ARC who had been designated to lead the transition for dining services. (McAleese Depo. at 14-15, 28, 31-32, 53-54).

On January 20, 2005, ARC, through its representative Haimbaugh, gave oral notice to Morrison that it intended to terminate the Morrison Agreement. (Lloyd Depo., at 132; Haimbaugh Depo at 123-24). During that meeting, Morrison's representative asked Haimbaugh if she had read Article 3.2, which "says you have to give, you know, six – you can't terminate for six months." (Lloyd Depo., at 112). Haimbaugh responded "we need to have legal look at it. And [Morrison's representative] agreed with her that it was above her . . and that [they] would let legal look at the contract." (Lloyd Depo., at 112). Haimbaugh never told Morrison that "ARC is not going to terminate that Morrison contract." (Lloyd Depo., at 127).

After that meeting, on or about January 24, 2005, Senior Living sent a letter to Morrison asking for its consent to the purchase agreement between ARC and Senior Living, including the assignment of the Morrison Agreement to ARC. (Doc. # 27, Exs. G, F; Haimbaugh Depo., PX 7, PX8). Morrison executed the consent letter. (Doc. # 27, Ex. F).

---

[2] Internal ARC correspondence indicates that ARC had decided to replace Prosch with Read as early as January 12, 2005. (Doc. # 27, Ex. I). By February 2005, Read had assumed the role of Executive Director at Galleria Woods. (Ader Depo., at 28; Hopkins Depo., at 61).

Thereafter on January 31, 2005, ARC gave written notice of its intent to terminate the Morrison Agreement. (Haimbaugh Depo., at 80, 130,131).   ARC paid Morrison its contract fee for sixty (60) days and relieved Morrison of its performance duties on February 28, 2005.  (Haimbaugh Depo., at 80-81).

### B.       Alleged Solicitation of Employees

Section 6.2 of the Morrison Agreement provides that Senior Living (and thus ARC, by assignment), during the term of the Agreement and for a period of one year after the Agreement's termination (the "Period of Restriction"), will not "divert, solicit or hire away" any of Morrison's management personnel who performed services at Galleria Woods.  (Haimbaugh Depo., PX 5).

On or before January 20, 2005, ARC placed an advertisement in the newspaper announcing several job openings at Galleria Woods, including openings for a Director of Dining Services, chef, dining room wait staff and dishwashers. (Hopkins Depo. at 72).  Although the advertisement had been approved by Haimbaugh for release after the January 20 meeting with Morrison in which ARC gave verbal notice of intent to terminate the contract, the advertisement was released earlier "through a miscommunication," and "dining services [employees] found out that they no longer ha[d] jobs based on [the] ad."  (Haimbaugh Depo., at 109).

Haimbaugh then met with Ader and Hopkins to discuss the advertisement on January 20. (Haimbaugh Depo., at 109; Ader Depo. at 63).  It was during this meeting that Morrison claims Haimbaugh solicited Ader and Hopkins in violation of the Morrison Agreement.  (Ader Depo., at 68).  Ader testified as follows about the meeting:

> A.  She basically phrased it as, I don't know what your future holds or where you're going, but if you're interested in our, you know, organization either right now or, you know, individually you can come to us; that if you would like to apply for a position.

5

And during that, I declined immediately.  I told her I have a non-compete.  I told her in the contract, we have a stipulation if you want to hire any management team, it would be a two-year salary.  And I said I could not speak for Cleola at that time, and that was about it.  It was a very nice, very comfortable meeting.

Q. What did Cleola [Hopkins] say during this time?

A.  She didn't - - she said thank you for the opportunity.  She is very quiet, very timid, and she sat there and listened.  She didn't say anything.

* * *

A.  No.  When I said offered employment, basically it was a chance to become employed with ARC.  That's what she said, the interview process.

(Ader Depo. at 68-72).  Hopkins testified:

Q.  Did you ever talk to Ms. Haimbaugh about at a job at ARC?

A.  Not really, no.

Q.   When you say not really, is it - - Was there some conversation with Ms. Haimbaugh about a job at ARC?

A.  There was an incident where the news media had published the director's job in the papers before she could get to us to tell us what was going on.  I think that's before the transition.  And during the process I asked her a question about hiring and would there be an RD hired.  And she apologized for the newspaper ad and then the statement was made if we wanted a position with ARC, if we might be interested.  But that's about it.  That's the only conversation we had about a job.

Q.  Who else was at this meeting?

A.  Harris [Ader].

* * *

Q.  And do you remember what Ms. Haimbaugh said about if you were interested in a job with ARC?  Just the substance of the conversation with her, Ms. Hopkins.

A.  We would be glad to accept the applications.

* * *

6

Q.      Tell me what you and - - what you remember Ms. Haimbaugh saying to you about a job with ARC?

A. If you are interested in a job, we will be more than glad to take your applications.

* * *

Examination by Mr. Umbach.

Q.  Still talking about the meeting with Ms. Haimbaugh, did she say anything to you about the contract with Morrison?

A.  Yes.

Q.  What did she say about that?

A.  That was during the meeting, she was apologizing for the ad, and assured us that ARC would not do anything like that.  And she mentioned she didn't know what Morrison's contract was, but if we should be out of a job, then, you know, we can be more than welcome to apply for work.

(Hopkins Depo. at 71-73, 81-82, 103).

Haimbaugh testified that she met with Hopkins and Ader to apologize for the early release of the advertisement and to tell them that "[t]his is not how we would have intended for you to find out that we were going to be cancelling our contract."  (Haimbaugh Dep., at 110).   Haimbaugh recalls that Hopkins asked her if she could apply for the position, to which Haimbaugh responded that she did not know what Hopkins' agreement was with Morrison, but "if Morrison[] does not have a place for you, you know, you could fill out an application just like everybody else who's filling out applications from the newspaper ad . . . . if she was not bound legally by Morrison[]."  (Haimbaugh Dep., at 111-12).

Hopkins further testified that after she left Galleria Woods and accepted a job with Morrison at its Tupelo, Mississippi facility, Dave Wood, ARC's interim chef at Galleria Woods, contacted her on her first day on the job:

> A.  He called to let me know that the position for CDM was still open, there was a position still open, and if I was - - wanted to know if I was interested in it.
>
> * * *
>
> Q. What, if anything, did you say to Mr. Woods?
>
> A.  I was interested.
>
> Q. Then what was the next thing that happened with respect to that?
>
> A.  He asked when might I be able to start.  And I told him probably March 14th.

(Hopkins Depo. at 87-88). Thereafter, Hopkins applied for a job with ARC in February 2005, quit her job at Morrison's, and began working for ARC on March 14, 2005.  (Hopkins Depo., at 71, 88). Ader has been continuously employed by Morrison's since 2004.  (Ader Depo., ats 21, 81-88).

## III.    Applicable Substantive Law and Discussion

Morrison has alleged three main claims in this litigation:   (1) breach of contract regarding termination of the Morrison Agreement (Sections 3.2 of the Agreement); (2) breach of contract regarding solicitation of Ader and Hopkins (Section 6.2 of the Agreement); and (3) fraudulent inducement.[3]  (Doc. # 18).  The court will address each claim in turn.

---

[3] Morrison's complaint also includes a separate count claiming attorney's fees pursuant to Section 11.5 of the Agreement, which provides:

> If Morrison deems it necessary to enforce this Agreement by or through an attorney at law, Senior Living shall pay to Morrison upon demand all costs and expenses incurred by Morrison in connection with such collection, including, without limitation, attorney's fees.

### A.    Breach of Contract Regarding Termination of Agreement

Morrison first alleges that ARC breached the Section 3.2 of the Morrison Agreement by terminating the Agreement within six months of a change of primary contact and thus failing to provide proper notice of termination.  The parties do not dispute that ARC had the right to terminate the Agreement and that a sixty-day notice of a termination was given; rather, they disagree about whether ARC was required to give Morrison the default sixty-day notice or the restricted six-month notice.  The crux of the dispute is one of contract construction – whether ARC's termination notice was controlled by Section 3.1 of the Morrison Agreement (which allows either party to terminate the Agreement for any reason upon sixty days notice) or Section 3.2 (which restricts the ability to terminate to six months after any change in "primary contact").

It is well-settled under Georgia law that "construction of a contract is a question of law for the court."  Ga. Code Ann. § 13-2-1*;  see also Knott v. Knott*, 589 S.E.2d 99 (Ga. 2003). "If the terms used are clear and unambiguous they are to be taken and understood in their plain, ordinary, and popular sense." *Akron Pest Control v. Radar Exterminating Co., Inc.,* 455 S.E.2d 601, 602 (Ga.

---

(Arie Depo., PX 5, ¶ 11.5).  Although both parties briefed the issue of attorney's fees, they are in agreement that pursuant to Georgia law, which provides the rule of decision in this case, attorney's fees are recoverable when provided by the terms of a contract *if* the party seeking to recover those fees *prevails*.  *City of Lawrenceville v. Heard,* 391 S.E.2d 441 (Ga. App. 1990) (holding that attorney's fees are recoverable when authorized by contract); *Willis v. Kemp*, 204 S.E. 2d 486, 490 (Ga. App. 1974) (holding that the plaintiff was not entitled to attorney's fees because he failed to recover other elements of damage).  Thus, the parties agree that, to the extent Morrison seeks to recover attorney's fees for claims without a finding that it is entitled to other damages, those fees are barred.  However, if Morrison is successful on any of its claims, and thus prevails, Morrison is entitled to attorney's fees, as well as costs and expenses relating to this lawsuit.  *Sylar v. Hodges*, 550 S.E.2d 438, 439 (Ga. App. 2001).  The court need not rule on the parties' motions as it relates to attorney's fees as there is no dispute regarding Morrison's entitlement to attorney's fees if it prevails.  Nonetheless, the issue of attorney's fees is not one to be decided today because it has yet to be determined whether Morrison will prevail before the trier of fact on any of its remaining claims.

9

App. 1995).[4] However, if an ambiguity is present, the court is to apply the Georgia statutory rules

of contract construction, including construing any such ambiguity against the drafter. Ga. Code Ann.

§ 13-2-2[5]; *Anderson v. Southeastern Fidelity Ins. Co.*, 307 S.E.2d 499 (Ga. 1983).  O n l y   i f   a n

---

[4] Furthermore, "the entirety of the agreement should be looked to in arriving at the construction of any part. … The contract is to be considered as a whole, and each provision is to be given effect and interpreted so as to harmonize with the others."  *Blueshift, Inc. v. Advanced Computing Technologies, Inc.*, 616 S.E.2d 816, 819 (Ga. App. 2005).

[5] Section 13-2-2 provides:

The following rules, among others, shall be used in arriving at the true interpretation of contracts:

(1) Parol evidence is inadmissible to add to, take from, or vary a written contract. All the attendant and surrounding circumstances may be proved and, if there is an ambiguity, latent or patent, it may be explained; so, if only a part of a contract is reduced to writing (such as a note given in pursuance of a contract) and it is manifest that the writing was not intended to speak the whole contract, then parol evidence is admissible;

(2) Words generally bear their usual and common signification; but technical words, words of art, or words used in a particular trade or business will be construed, generally, to be used in reference to this peculiar meaning. The local usage or understanding of a word may be proved in order to arrive at the meaning intended by the parties;

(3) The custom of any business or trade shall be binding only when it is of such universal practice as to justify the conclusion that it became, by implication, a part of the contract, except in regard to those transactions covered by Title 11;

(4) The construction which will uphold a contract in whole and in every part is to be preferred, and the whole contract should be looked to in arriving at the construction of any part;

(5) If the construction is doubtful, that which goes most strongly against the party executing the instrument or undertaking the obligation is generally to be preferred;

(6) The rules of grammatical construction usually govern, but to effectuate the intention they may be disregarded; sentences and words may be transposed, and conjunctions substituted for each other. In extreme cases of ambiguity, where the

ambiguity remains after application of the statutory rules of contract construction must the ambiguity be resolved by the trier of fact. *Blueshift*, 616 S.E.2d at 819; *Parkside Center, Ltd. v. Chicagoland Vending, Inc.*, 552 S.E.2d 557 (Ga. App. 2002) (stating the jury does not become involve in the contract construction process, even if the contract is difficult to construe, until an ambiguity appears that cannot be resolved by the rules of contract construction set forth in Ga. Code Ann. § 13-2-2).

Thus, it is for this court to determine whether the following pivotal language of Section 3.2 contains an ambiguity and if so, whether that ambiguity can be resolved pursuant to the rules outlined in Section 13-2-2:

> 3.2    Notwithstanding § 3.1 above, the parties acknowledge that significant effort and expense has been made by each party in developing the relationship and pursuing the opportunity to reach this Agreement.  As a result, the parties agree that this Agreement shall not be terminated by Senior Living *within six (6) months of any change by Senior Living of its primary contact with Morrison*, unless such termination is based upon a material breach of this Agreement by Morrison which is not cured within thirty (30) days of written notice to Morrison.

---

instrument as it stands is without meaning, words may be supplied;

(7) When a contract is partly printed and partly written, the latter part is entitled to most consideration;

(8) Estates and grants by implication are not favored;

(9) Time is not generally of the essence of a contract; but, by express stipulation or reasonable construction, it may become so.

Georgia Code § 13-2-2.

(Haimbaugh Depo., Ex. 2, PX 5) (emphasis added).  Ironically, although both parties contend that Section 3.2 is unambiguous in its meaning,[6] they wholeheartedly disagree about the correct interpretation of that provision.

ARC focuses on the introductory language of the provision ("Notwithstanding § 3.1 above, the parties acknowledge that significant effort and expense has been made by each party in developing the relationship and pursuing the opportunity to reach this Agreement. As a result . . . .") as evidence that the Section 3.2 six-month restriction on termination no longer applies at this point in the contract life.  ARC argues that Section 3.2 was only meant to be a *temporary* restriction on termination rights, intended to protect Morrison's initial "significant effort and expense" and to allow Morrison to recoup its initial investment before the contract could be terminated by Senior Living.  Presumably according to ARC's interpretation, once Morrison recouped its 1996 initial investment in the Agreement, the six-month termination notice outlined in Section 3.2 was moot, and any future termination would and could be governed *only* by the default sixty-day notice contained in Section 3.1.

Morrison, on the other hand, focuses not on the introductory language, but on the directive contained in the heart of the provision ("[T]he parties agree that this Agreement shall not be terminated by Senior Living within six (6) months of any change by Senior Living of its primary contact with Morrison.").  According to Morrison's interpretation, Section 3.2 means just what it says.  At any time, any change in primary contact – by Senior Living or its permitted assignee – is sufficient to trigger the application of the six-month notice period. Morrison points out that the

---

[6] The court notes that ARC also argues alternatively that Section 3.2 is ambiguous and must be construed against the drafter.  Because the court has determined that the meaning of the provision is clear, it need not address that argument.

introductory language on which ARC focuses contains no time restriction nor any instruction that the provision would expire once Morrison recouped its initial investment. Thus, Morrison contends that its interpretation is the better reading of the provision as a whole, without giving any undue deference to particular portions of that whole.

Having considered the arguments of both parties, the court finds that Section 3.2 is unambiguous that, once a change in primary contact has occurred - without regard to when that change occurs in the life of the Agreement - the six-month restriction on termination is triggered. Although the provision's acknowledgment that significant effort and expense were invested may be "important background information" (Doc. # 30, at 19), it does not limit the provision's application to early termination shortly after the contract was formulated.[7] Rather, Section 3.2 unambiguously provides Morrison a six-month grace period to establish a relationship with a new contact *whenever* that new contact arises. The court does not disagree with ARC that if Senior Living could have terminated its contract with Morrison on sixty-days notice, then ARC, standing in the shoes of its assignor, could have as well. It also follows that, once the primary contact changed – whether by Senior Living or its assignee ARC – the restriction of Section 3.2 was triggered and any proposed termination of the Agreement must be delayed six months.[8]

---

[7] The court agrees with the Appellate Court of Illinois that "'Notwithstanding' means 'in spite of,' and therefore is an exception to all other sections [ ], and controls over any other section [ ] with which it conflicts." *Waliczek v. Retirement Bd. of the Firemen's Annuity & Benefit Fund of Chicago*, 318 Ill. App. 3d 32, 36 (2000).

[8] The court acknowledges, but reads nothing into, Morrison's recent decision to alter Section 3.2 from requiring a six-month notice after a change in primary contact to requiring a six-month notice after a *significant change in Client ownership or administration.* (See Arie Depo., DX 5,6) (emphasis added). The court is not persuaded that Morrison's decision to change the language is an indication that the section was ambiguous (as ARC argues in the alternative). The court cannot presuppose what reasons played a role in that decision – whether it be the personal preference of the

Despite the court's finding that the meaning of Section 3.2 is unambiguous, its application in this case remains uncertain because the evidence concerning whether the primary contact did, in fact, change is in dispute.  It is undisputed that prior to the sale of Galleria Woods and the assignment of the Morrison Agreement to ARC, Morrison's primary contact was Liz Prosch (Hopkins Depo. at 40, Ex. D; Ader Depo. at 22), and that at some point after the sale, Prosch was replaced with Read.  (Doc. # 27, Ex. I;  Ader Depo., at 28; Hopkins Depo., at 61).   It is also undisputed that on or before the date on which ARC gave termination notice to Morrison, Ader was informed that he would report to Roger McAleese, a Regional Director of Dining Services for ARC who was leading the transition for the dining services department.  (McAleese Depo. at 14-15, 28, 31-32, 53-54).  Nevertheless,  the parties dispute: (1) whether the temporary instruction to Morrison that it report to McAleese during the transition was enough to constitute a change in primary contact, and (2) whether Prosch's permanent replacement, Read, assumed the role of "primary contact" before or after the contract was terminated.[9]  Thus, although the undisputed evidence is clear that a change in primary contact did occur at some point after the assignment of the Morrison Agreement to ARC, the evidence conflicts as to whether that change occurred before ARC gave its notice of termination (implicating Section 3.2 and requiring a six-month termination notice) or after ARC had already terminated the contract (which would have no effect on the notice period such that the

---

particular lawyers involved in the contract negotiation or the very existence of this lawsuit disputing the correct interpretation of that language.  Such speculation does not play a role in this analysis.

[9] As noted earlier, internal ARC correspondence indicates that ARC had decided to replace Prosch with Read as early as January 12, 2005.  (Doc. # 27, Ex. I). Verbal notification of intent to terminate the contract was given to Morrison on January 20, 2005.  By February 2005, Read had assumed the role of Executive Director at Galleria Woods.  (Ader Depo., at 28; Hopkins Depo., at 61).

default sixty-day notice was sufficient).  The matter of whether Section 3.2 was triggered such that ARC breached that provision when it gave less than a six-month termination notice is for the trier of fact to decide.[10] Because the court finds that the meaning of Section 3.2 is clear but its application to the facts of this case is not, summary judgment is due to be denied as to Morrison's breach of contract claim regarding termination notice.

### B.     Breach of Contract Regarding Solicitation of Ader and Hopkins

Plaintiff also claims that ARC breached Section 6.2 of the Morrison Agreement by soliciting for employment Ader and Hopkins, two management employees of Morrison.  Section 6.2 provides that Senior Living (and thus ARC, by assignment), during the Period of Restriction, will not "divert, solicit or hire away" any of Morrison's management personnel who performed services at Galleria Woods.  (Haimbaugh Depo., Ex. 2, PX 5).  The provision provides for an award of liquidated damages upon a breach which would require ARC to pay Morrison an amount equal to two years salary of the solicited or hired employee.  (Haimbaugh Depo., Ex. 2, PX 5).  The testimony of Ader and Hopkins indicates that during the Period of Restriction, an ARC representative had an employment conversation with them that could be construed as solicitation. (Ader Depo. at 68-72; Hopkins Depo. at 71-73, 81-82, 87-88, 103).  ARC disputes the assertion that solicitation occurred, arguing that the ARC suggested employment opportunities to Hopkins and Ader only if Morrison did not have a place for them.  (Doc. # 30, at  14-15).  The court will examine separately the application of Section 6.2 as it relates to each employee.

---

[10] The court notes that it is not persuaded by Morrison's argument that the mere acquisition of Galleria Woods by ARC worked a "change in primary contact" triggering the six-month termination limitation.  It is certainly possible that ARC could have received the Morrison Agreement by assignment and decided to keep all the principal personnel in place - including the primary contact. In that case, Section 3.2 would not be triggered.

1.        **Section 6.2 as it Relates to the Solicitation of Hopkins**

ARC argues that it is due summary judgment on Plaintiff's breach of contract claim as to Section 6.2 because that provision is unenforceable as to Hopkins, who never agreed to the restraint on her employment and future job opportunities.  The parties agree that while Georgia law governs the Morrison Agreement, Section 6.2 must also comport with Alabama public policy to be enforceable.  *See Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506 (Ala. 1991).[11]  The court finds that the provision at issue as applied to Hopkins does not comply with Alabama public policy as established by the Alabama Supreme Court and thus is unenforceable as it relates to her employment.[12]

An examination of Alabama's public policy as to the type of no-solicitation/no-hire provision at issue in this case reveals the Alabama Supreme Court's holdings in *Dyson Conveyor Maintenance, Inc. v. Young & Vann Supply Co.*, 529 So. 2d 212 (Ala. 1988) and its progeny to be dispositive.  In *Dyson*, a no-solicitation/no-hire provision prohibited two competing companies from hiring each

---

[11] Alabama follows the choice of law "principle of lex loci contractus, which states that a contract is governed by the laws of the state where it is made except where the parties have legally contracted with reference to the laws of another jurisdiction."  *Cherry, Bekaert & Holland v. Brown*, 582 So. 2d 502, 506 (Ala. 1991).  Nonetheless, a court must inquire into the effect the choice of law could have on the "fundamental public policies of the forum state. …" *Blalock v. Perfect Subscription Co.*, 458 F. Supp. 123 (S.D. Ala. 1978) (holding the chosen forum's law would enforce the application of a non-compete agreement, but that enforcement 'flies directly in the face of the public policy of Alabama as set out by statute' and could not be given effect); *Crown Castle USA, Inc. v. Howell Engineering and Surveying, Inc.,* --So. 2d --, 2005 WL 1994256, at * 4 (Ala. Civ. App. Aug. 19, 2005)(refusing to honor the parties' choice of  Pennsylvania law, because enforcement of the contract under that state's law "would fly in the face of Alabama's public policy disfavoring noncompetition agreements").

[12] Given that Alabama law and Georgia law are the only relevant bodies of law as to this particular issue, Morrison's reliance on cases from other jurisdictions, including *H & M Commercial Driver Leasing, Inc. v. Fox Valley Containers, Inc.*, 805 N.E.2d 1177 (Ill. 2004), is unavailing.

other's employees: "neither of us will offer employment to any person at the time, or who was within six (6) months before, employed by other. Neither of us will do anything to encourage any employee of the other to leave the employment of the other." *Dyson*, 529 So. 2d at 213. Upon review of the provision, the Alabama Supreme Court noted that the agreement "appears to violate [Ala. Code] § 8-1-1"[13] because it restrains the employees of both companies from exercising a lawful profession or trade. 529 So. 2d at 215. Although the court noted that partial restraints of trade may be valid "where the one who is restrained from engaging in some aspect of a trade or business has entered into a contract, for consideration, with the party seeking to enforce the contract," no such contract or agreement existed in that case. Therefore, the court noted that employers are not permitted "to restrain employees from competing with their former employers *without the employees having entered into such an agreement*." 529 So. 2d at 215 (emphasis added).

In this case, Hopkins, like the plaintiff in *Dyson,* never agreed *herself* not to work for ARC after her employment with Morrison. Rather, the restraint that Morrison seeks to impose on her is contained in the Morrison Agreement with Senior Living/ARC, to which Hopkins was not a party. Under those circumstances, such a provision is not enforceable in Alabama. *See also Defco, Inc. v. Decatur Cylinder, Inc.*, 595 So. 2d 1329, 1331 (Ala. 1992)("Section 10 of the contract at issue here purported to at least partially restrain Defco's employees from engaging in their trade, and there is no evidence that those employees had entered into non-competition agreements with Defco.")

The court is not persuaded by Plaintiff's argument that the "no-switching provisions" at issue in *Dyson, Defco,* and *Crown Castle USA, Inc.* are distinguishable from the "anti-raiding provision"

---

[13] Section 8-1-1 provides: "Every contract by which anyone is restrained from exercising a lawful profession, trade or business of any kind otherwise than is provided by this section is to that extent void." ALA. CODE § 8-1-1(a) (1975).

at issue in this case that sought to protect Morrison because of the employees' close working relationship with ARC. Morrison's argument is built upon irrelevant semantics. The provisions at issue in *Dyson, Defco,* and *Crown Castle USA, Inc.* were substantially similar to the one in this case -- a company-to-company agreement not to hire the employees of another company for a specified period of time. *Dyson*, 529 So. 2d at 213; *Defco,* 595 So. 2d at1331; *Crown Castle USA, Inc.*, 2005 WL 1994256, at * 4. Whether the relevant provision was a mutual agreement not to hire, or a singular restriction on one company's ability to hire, is a distinction without a difference. The dispositive issue in both this case and *Dyson* and its progeny is the fact that the employee at issue had not agreed or consented to the provision.

Moreover, Morrison's point that it places the blame on ARC for improperly soliciting Hopkins, not on Hopkins for improperly terminating her employment, has no impact on the court's analysis. Under the applicable caselaw, it is irrelevant that Morrison never told Hopkins that she was forbidden from working for ARC or that Hopkins eventually was hired by ARC. (Hopkins Depo. at 96). In fact, the solicited employees in *Dyson*, *Defco*, and *Crown Castle USA, Inc.* were all hired by the competitor employer (who was sued for that hiring decision) and thus did not experience actual restraint in the form of being denied a job offer or prevented from working for the competitor. Nonetheless, in those cases, the Alabama Supreme Court concluded that a potential employer's agreement not to solicit or hire the employee of its competitor *effectively* restricts the employee's employment opportunities, even if the employee in fact experienced no direct restraint from its employer. Alabama law could not be clearer–there can not be any restraints on future employment (like the one in this case) unless the employee has consented to such a restraint and this rule applies regardless of the actual effect it has on an employee's opportunities.

Having determined that Section 6.2 is unenforceable as to Hopkins under Alabama law, the court need not consider whether the provision is valid under Georgia law. Accordingly, the court finds that, ARC is due summary judgment on Morrison's claim that it breached Section 6.2 of the Agreement when it solicited Hopkins for employment.[14]

### 2.    Section 6.2 as it Relates to the Solicitation of Ader

With respect to Ader, who admits that he signed and is bound by a covenant not to compete with Morrison, (Ader Depo. at 69,122-23), ARC has not questioned the enforceability of Section 6.2. Morrison, however, has moved for summary judgment in its favor on its claim that ARC solicited Ader. In response, ARC maintains that disputed issues of material fact prevent summary judgment on the issue of whether Haimbaugh's statements to Ader constituted solicitation in violation of Section 6.2. Moreover, ARC argues that the liquidated damages portion of Section 6.2 is unenforceable as to Ader such that at the very most, Morrison is entitled only to any actual damages it can prove as a result of such a breach. The court considers the two issues independently.

### a.    Solicitation of Ader in Violation of Section 6.2

Although Morrison claims that it is due summary judgment on its breach of contract claim for solicitation of Ader because "[t]he deposition testimony of Ader . . . does not dispute that during

---

[14] The court is likewise not persuaded by Morrison's last-ditch suggestion that the court should reform or "blue pencil" Section 6.2 "to remove the unenforceable portion while leaving in place that portion of Section 6.2 that is valid." (Doc. # 29, at 15-16) (citing *KW Plastics v. U.S. Can Co.*, 2001 WL 135722 (M.D. Ala. 2001)). First, the case upon which Plaintiff relies for "reformation" of the no-solicitation/no-hire provision in this case involved a completely different factual scenario – a non-competition agreement that violated the Sherman Act. In any event, Plaintiff does not even attempt to suggest how the court would reform the provision at issue to render it enforceable as to Hopkins, and for good reason. The problem with Section 6. 2 – that Hopkins, a third party, never agreed to have her employment options limited – is simply not a problem with the scope of the provision that is capable of remedy by reformation.

the Period of Restriction, ARC [through Haimbaugh] solicited [him]," (Doc. # 25, at 17 (citing Ader Depo. at 68-72)), Morrison ignores the summary judgment standard. It is axiomatic that summary judgment in favor of Morrison on this claim is proper only when there are no genuine issues of material fact, and all reasonable doubts about the facts and all justifiable inferences are resolved in favor of nonmovant ARC. *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). In this case, despite Ader and Hopkins' testimony, Haimbaugh has testified that she mentioned ARC employment opportunities to Ader only "if Morrison's does not have a place for you." (Haimbaugh Depo., at 111). Because Haimbaugh did not ask Ader to leave Morrison in order to work for ARC, ARC contends that Haimbaugh's qualified offer was not "solicitation" under Section 6.2. Because the evidence regarding the alleged solicitation meeting is disputed, and because this court must view the facts in the light most favorable to ARC, the court finds that a jury must decide whether Haimbaugh's conversation with Ader constituted solicitation in violation of Section 6.2 of the Agreement. Thus, Morrison's motion for summary judgment on this claim is due to be denied.

### b.    Liquidated Damages Portion of Section 6.2

Although Morrison may recover actual damages if the jury finds in its favor on the solicitation claim, this court must decide whether Morrison - if it prevails - is also entitled to an award of liquidated damages as provided for in the Morrison Agreement. The Georgia Supreme Court[15] has articulated a three-part test for determining whether a liquidated damages provision is

---

[15] As noted earlier, although the parties have agreed that Georgia law governs the Agreement in this case, the court must nonetheless take into account whether the contract provision at issue offends the public policy of Alabama. With regard to liquidated damages provisions, however, the laws of Georgia and Alabama are substantially similar – both states recognize the validity of liquidated damages provisions but require that they not be penal in nature. *Compare Camelot Music Inc. v. Marx Realty Imp. Co., Inc.*, 514 So. 2d 987, 989 (Ala. 1987) *with Liberty Life Ins. Co. v. Thomas B. Hartley Const. Co.*, 375 S.E.2d 222, 223 (Ga. 1989); O.C.G.A. § 13-6-7. Because the parties'

enforceable: (1) the injury must be difficult to accurately estimate, (2) "the parties [must have] intended to provide for damages rather than a penalty" and (3) the liquidated amount must be a "reasonable pre-estimate of the loss." *Liberty Life Ins. Co. v. Thomas B. Hartley Const. Co.*, 375 S.E.2d 222, 223 (Ga. 1989).   Liquidated damages provisions are strictly construed to ensure that operation of the clause does not impose a penalty upon the party allegedly in breach. *Caincare, Inc. v. Ellison*, 612 S.E.2d 47, 50 (Ga. 2005) ("In cases of doubt, the courts favor the construction which holds the stipulated sum to be a penalty, and limits the recovery to the amount of damage[s] actually shown, rather than a liquidation of the damages.").

Against this backdrop of strict scrutiny, the court finds that the liquidated damages provision at issue here is unenforceable as it relates to ARC's alleged solicitation of Ader.  It is undisputed that Morrison's claim with regard to Ader is based on a single invitation to apply for a job with ARC that never culminated in his application or hire, *i.e.* a solicitation.   (Ader Depo., at 81-88, 93). Nonetheless, the liquidated damages provision of the Agreement provides for  payment in the amount of *two years salary* for any one violation - including one unsuccessful solicitation.  Because this court must favor the construction of Section 6.2 which holds the stipulated sum to be a penalty, *see Caincare*, 612 S.E.2d at 50, and because the amount of liquidated damages provided for in the Agreement is grossly disproportionate to any loss suffered for the mere solicitation of an employee who has remained continuously employed,[16] the court finds that the Agreement's liquidated damages

---

briefs both cite primarily to Georgia law, and because there are no material differences in the laws of both states, the court's analysis will cite to Georgia case law.

[16] Although Morrison maintains that such an amount closely approximates the cost expended in training and maintaining the solicited employee as well as having to recruit, hire and train a new employee, that argument would be more persuasive in the case of an employee who actually left the company.

provision amounts to nothing more than an unenforceable penalty.  *See Habif, Arogeti & Wynne v. Baggett*, 498 S.E.2d 346 (Ga. App. 1998) (invalidating a liquidated damages clause wherein the defendant's violation of a non-solicitation provision would trigger damages equal to 150% of the prior years' client billing, whether the solicitation was successful or not).  Thus, ARC is due summary judgment as to Morrison's claim for liquidated damages for the alleged solicitation of Ader.

Although the court finds that the liquidated damages provision is unenforceable, it nonetheless can be severed from the Agreement.  *See Habif*, 498 S.E.2d at 356.  Section 11.2 of the Agreement states:

> In case one or more provisions contained in this Agreement, or parts hereof, should for any reason be held to be invalid, illegal or unenforceable in any respect by a court of competent jurisdiction, the same shall not affect any other provision in this Agreement, or part hereof, but this Agreement shall be construed as if such invalid, illegal or unenforceable provision, or part hereof, had never been contained herein.

(Haimbaugh Depo., Ex. 2, PX 5).  Therefore, "the remainder of the contract stands," *Habif*, 498 S.E.2d at 356, and if a jury finds that ARC did breach Section 6.2 by soliciting Ader, Morrison still is entitled to the actual amount of damages it sustained as determined upon a hearing of the evidence.  *See Caincare, Inc. v. Ellison*, 612 S.E.2d 47, 50 (Ga. 2005) (limiting plaintiff's recovery of damages to actual damages when liquidated damages provision held unenforceable).[17]

---

[17] The parties dispute whether Morrison suffered any actual damages by the solicitation of Ader.  Morrison maintains that the solicitation caused actual damages including the time Ader spent away from the job while being solicited, the lost motivation from knowing a position is open to him at any time leading to a decline in worker productivity, as well as time spent by other Morrison employees addressing the Ader' solicitation and retaining him as an employee.  (Doc. # 29, at 18-19).  ARC maintains that none of these alleged "damages" actually resulted in loss to Morrison.  (Doc. # 32, at 4-5).  These are issues for the trier of fact to decide upon hearing the evidence.

C.        **Fraudulent Inducement**

Morrison next alleges that ARC fraudulently induced Morrison's consent to the purchase agreement between ARC and Senior Living, including the assignment of the Morrison Agreement to ARC, with no intention to follow through on that assignment. Again, the parties agree that Georgia law applies to this claim because, pursuant to Alabama's choice of law rules, the law of the place of the injury applies and any injury suffered by Morrison would have occurred in Georgia. *Klaxon Co. v. Stentor Elec. Co.*, 313 U.S. 487 (1941) (holding that a federal court sitting in diversity must apply the choice of law of the forum in which it sits.); *Harris v. Freightliner Corp.*, 354 F. Supp. 2d 1266 (M.D. Ala. 2004) (noting that under Alabama's choice of law rules regarding tort claims, the law of the place of the injury, or *lex loci delicti*, controls.). Under Georgia law, a plaintiff claiming fraudulent inducement must prove each of the following elements: (1) false representation; (2) scienter; (3) intent to induce the plaintiff to act or refrain from acting; (4) justifiable reliance; and (5) damages proximately caused by the representation. *Jarallah v. Schoen*, 531 S.E.2d 778, 780 (Ga. App. 2000).[18]  For the reasons outlined below, the court finds that summary judgment is due to be granted in favor of ARC as to Morrison's fraudulent inducement claim that ARC knew at the time it entered into the assignment that it was not going to assume Senior Living's obligations under the Morrison Agreement but sought Morrison's consent to the agreement anyway.

While Morrison's argument may be the basis for a breach of contract claim related to the assignment from Senior Living or even the Morrison Agreement itself, it is not the basis of a

---

[18] In any event, the elements of fraudulent inducement under Alabama law are substantially the same. *Hunt Petroleum Corp. v. State*, 2004 WL 924138 (Ala. April 30, 2004) ("Fraud, as a cause of action, requires some damage stemming from reliance on a misrepresentation or suppression intended to induce that reliance, i.e., reliance that caused someone to act or to refrain from acting.").

fraudulent inducement claim.  *See, e.g., Deupree v. Butner*, 522 So. 2d 242, 245 (Ala. 1988) ("[I]t is clear that to assert a fraud claim that stems from the same general facts as one's breach of contract claim, the fraud claim must be based on representations independent from the promises in the contract and must independently satisfy the elements of fraud.").  First, Senior Living – not ARC – requested that Morrison consent to the purchase agreement and assignment of its contract. (Haimbaugh Depo., PX 7 and 8).  Thus, any fraudulent inducement claim regarding that solicited consent should be directed at Senior Living, not ARC.

Moreover, there was simply no false representation made by ARC upon which Morrison could base a fraudulent inducement claim. Morrison's representative admitted that ARC promised Morrison that "ARC is not going to terminate that Morrison contract."  (Lloyd Depo., at 127).  In fact, on January 20, 2005, ARC gave oral notice to Morrison that it did intend to terminate the Morrison Agreement.  (Lloyd Depo., at 132; Haimbaugh Depo at 123-24).  Although Haimbaugh indicated that she would have her legal team look at the contract when asked by Morrison if she understood the six-month notice requirement for termination in certain situations (Lloyd Depo., at 112), such a statement is not even close to a representation that ARC intended to continue the Morrison Agreement into perpetuity.  Furthermore, to the extent that Morrison suggests that ARC's acceptance of the Morrison Agreement by assignment was itself a fraudulent representation that ARC agreed to maintain that relationship with Morrison, such a claim is woefully deficient. The Morrison Agreement provided a process for termination of the contract.  (Haimbaugh Depo., PX 7, PX8).  Just as Senior Living could have terminated the Morrison Agreement in accordance with the termination provisions, ARC had the right to do the same.  As ARC points out, the consent requested from Morrison was for Senior Living to *assign* the contract to ARC, not for ARC to *assume* the

contract without reservation.  The absence of any false representation made on behalf of ARC, who was not even responsible for asking  Morrison to consent to the assignment of the Morrison Agreement, is fatal to Plaintiff's fraudulent inducement claim.[19]

## IV.     Conclusion

For the reasons outlined above, the court finds that Morrison's Motion for Summary Judgment is due to be denied.  ARC's Motion for Summary Judgment is due to be granted, in part, as to the following claims asserted by Morrison: (1) breach of Section 6.2 of the Agreement as it relates to  solicitation of Hopkins; (2) liquidated damages for any alleged breach of Section 6.2 of the Agreement as it relates to solicitation of Ader; and (3) fraudulent inducement.  ARC's Motion for Summary Judgment is due to be denied, in part, as to Morrison's claim of breach of Section 3.2 of the Agreement relating to termination notice.  A separate order ruling on these motions will be entered.   In addition, as the remaining claims of breach of Section 3.2 of the Agreement relating to termination notice, and breach of Section 6.2 of the Agreement as it relates to solicitation of Ader

---

[19] Additionally, even if ARC's indication that it would discuss the termination provision with its legal team could  – in a parallel universe - be construed as a false representation that ARC would continue the contract with Morrison after the purchase of Galleria Woods (and the court expressly finds it was not), there is no evidence that Morrison could have justifiably relied upon such a representation.  It is undisputed that prior to the purchase of Galleria Woods by ARC, Morrison's Regional Director of Operations already had an "impression" that ARC performed its dining services in-house and did not contract them out. (Lloyd Depo., at 105).  Most significantly, however, ARC told Morrison on January 20, 2005, in a face-to-face meeting, that ARC intended to terminate the relationship.  (Lloyd Depo, at 131). Haimbaugh's plan to speak to ARC's lawyers did not alter ARC's communicated intent to terminate. Thus, four days before Senior Living even requested Morrison's consent to the purchase and assignment, Morrison was on notice that ARC planned to terminate the contract.  (Haimbaugh Depo., at 86, PX 7, PX 8).  Given all of the evidence suggesting that ARC would not continue to use Morrison at Galleria Woods, it is disingenuous for Morrison to contend that it relied on any representation made by ARC to the contrary.

(without the possibility of recovery of liquidated damages) are due to be tried to a jury, the court will set this case for pretrial conference by separate order.[20]

   **DONE** and **ORDERED** this   1st   day of December, 2006.

              **R. DAVID PROCTOR**
              UNITED STATES DISTRICT JUDGE

---

[20] As noted earlier, the parties also agree that Morrison is due to recover attorney's fees if it is the prevailing party. Nonetheless, the issue of attorney's fees is not ripe for determination until after the trier of fact renders a decision.